Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/28/2021 08:10 AM CDT

Tammy A. Toro, appellee, v.
Philip E. Toro, appellant.
___ N.W.2d ___

Filed September 21, 2021.    No. A-20-875.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
4. **Child Custody.** While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration.
5. **Visitation.** If a parent has been found to have committed child abuse or neglect, committed domestic intimate partner abuse, or interfered persistently with the other parent's access to the child, limits shall be imposed within the parenting plan that are reasonably calculated to protect the child or child's parent from harm.
6. **Child Support.** Before determining a parent's child support obligation, there must be a determination regarding the monthly incomes of the custodial and noncustodial parents.

7. **Taxation.** As a general rule, the income of a self-employed person can be determined from his or her income tax return.

8. **Divorce: Property Division.** In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties.

9. **Property Division.** Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties.

10. \_\_\_\_. Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed as modified.

Wesley S. Dodge for appellant.

Lindsay Belmont, of Koenig | Dunne, P.C., L.L.O., for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Philip E. Toro appeals the decree entered by the Douglas County District Court dissolving his marriage to Tammy A. Toro. He claims errors related to his parenting time, the income attributed to him for purposes of child support and related expenses, and the court's division of the parties' assets. We affirm the decree in all matters, but we modify to correct scrivener's errors in two places: (1) the language regarding the children's nonreimbursed health care expenses and (2) the omission of a pension fund in the allocation of retirement accounts. We also modify to clarify an obligation owed by Tammy to Philip. We affirm as modified.

## II. BACKGROUND

Tammy and Philip were married in 2005. Together they have two children—Josie Toro, born in 2005, and Jacob Toro, born in 2014. The parties separated on September 28, 2019. Tammy filed a pro se complaint for dissolution of marriage on October 16, seeking joint legal and joint physical custody of the parties' children, child support, and division of the parties' property and debts. On December 3, she filed an amended complaint through legal counsel, now seeking full custody of the parties' children, subject to Philip's right to limited and supervised parenting time. She also sought child support, an equitable division of the parties' property and debts, alimony, and attorney fees. In his answer filed on March 27, 2020, Philip alleged that both parties were fit and proper persons to be awarded legal and physical custody of the children.

On April 1, 2020, Tammy filed a motion for temporary order. She sought temporary legal and physical custody of the children, child support, and attorney fees. She also sought alimony or, in the alternative, an order for Philip to maintain the home-related expenses. She alleged that any parenting time awarded to Philip should take into consideration an ex parte domestic abuse protection order entered in February. Tammy also asked that the temporary order restrain Philip, both personally and financially.

The district court's temporary order was entered on April 30, 2020. Tammy was awarded temporary legal and physical custody of the children. Philip was awarded parenting time every Saturday from 10 a.m. to 5 p.m., as well as one weekday evening every week from after school (or 5 p.m. if school was not in session) until 8 p.m. Philip's significant other was not to be present during his parenting time. Philip was ordered to pay temporary child support of $973 per month, commencing retroactively to March 1. Temporary alimony was denied; however, commencing May 1, Philip was to be responsible for the "auto loan associated with the 2019 Chevrolet Silverado." Philip was restrained and enjoined by the court from transferring,

encumbering, hypothecating, concealing, or in any way disposing of the property of the parties other than in the usual course of business or other than for the necessities of life, until further order of the court. And during the pendency of the proceedings, Philip was restrained and enjoined from harassing, intimidating, coercing, bothering, assaulting, or in any other way impeding the peace and enjoyment of Tammy at her residence or any other location. The court stated that the separately docketed ex parte domestic violence protection order remained in full force and effect; however, the parties may communicate "only in regard to facilitating the temporary parenting time scheduled as ordered" and/or if there was an emergency affecting the children. (Emphasis in original.)

On June 4, 2020, Philip filed a motion asking the district court to conduct an in camera interview with Josie, one of the parties' children, alleging that her opinions were relevant to the court's determination of parenting time. Tammy objected to an in camera interview of Josie, alleging that Philip had alienated Josie from her, unnecessarily involved Josie in the proceedings, and coached Josie on what to say.

Trial was held on June 15 and July 16, 2020. Tammy and Philip both testified. Tammy also called other witnesses to testify on her behalf, and numerous exhibits were received into evidence. The testimony and exhibits will be discussed as necessary in our analysis. The district court did not conduct an in camera interview of Josie.

On September 29, 2020, Tammy filed a motion to reopen trial. Tammy alleged that new material had come to light, namely that Philip's girlfriend, Shannon Wood, gave birth to twins in September and that the twins were immediately placed into the temporary custody of the Nebraska Department of Health and Human Services, with placement to exclude the home of Philip (because of ongoing domestic violence with Wood) and Wood (because the twins tested positive for amphetamines at birth). Copies of juvenile court pleadings and orders, including an ex parte order for immediate temporary

custody, were attached to Tammy's motion. Tammy alleged that the evidence was "integral to the ultimate issues" at trial, and thus, she sought to reopen trial to provide such evidence to the district court. Tammy's motion reflected that an evidentiary hearing was scheduled for October 22. Philip filed an objection to Tammy's motion.

On October 5, 2020, Tammy filed a verified motion for an ex parte order, citing the juvenile court proceedings regarding Philip's newborn twins and asking the district court to require that Philip's parenting time with Josie and Jacob be supervised and that Wood continue to not be present during any supervised parenting time. On October 6, the district court granted Tammy's motion for an ex parte order, stating that an emergency existed and that Philip's parenting time with Josie and Jacob should be supervised until further order of the court. The matter was also set for hearing on October 22.

Prior to the hearing scheduled for October 22, 2020, on the matters just described, the district court entered a decree of dissolution on October 14. The court divided the parties' marital estate. Tammy was awarded legal and physical custody of the children, subject to Philip's supervised parenting time which was to occur every Saturday from 10 a.m. to 5 p.m., as well as one weekday evening every week from after school (or 5 p.m. if school was not in session) until 8 p.m. A holiday parenting time schedule was also established. Additionally, each parent was to have the right to 7 days of uninterrupted parenting time with the children each year. Wood was prohibited from being in the presence of the children until further order of the court. The court identified "Shaul Mediation" as an appropriate agency to supervise parenting time and stated that "the parties may agree on another appropriate person or agency." The court found that Philip had an annual earning capacity of at least $60,000 per year and ordered him to pay child support in the amount of $998 per month. Philip was ordered to pay 60 percent of all work-related childcare expenses. He was also ordered to pay 60 percent of all health care expenses incurred

on behalf of the children and not covered by insurance, after Tammy paid the "threshold amount of $250.00 per month [sic], per calendar year, per child."

On October 20, 2020, Philip filed a motion to alter the judgment or, alternatively, for a new trial. In support of his motion, Philip alleged that the district court ordered supervised parenting time, even though "[i]mmediately after trial, it appeared to the Court that no issues existed that warranted supervision of parenting time"; "James Shaul ha[d] moved . . . and [was] not an option as a supervisor"; the court held in abeyance its decision to hear testimony from Josie, whose desire should have been considered by the court; Tammy's ex parte motion requesting emergency custody, filed after trial but prior to the decree, alleged unsubstantiated facts which were not presented to the court in a formal hearing and such issues were still pending; the evidence presented at trial did not support the $60,000 income the court attributed to Philip for purposes of the child support calculation; as a result of the court's child support calculation, the percentages for childcare and other costs were not consistent with the evidence; and the court's division of the marital assets was unconscionable.

On October 20, 2020, Tammy withdrew her motion to reopen trial. On October 21, she filed a motion to alter or amend the decree. As relevant to this appeal, Tammy alleged that the district court adopted her proposed parenting plan and attached it to the decree; however, the parenting plan attached to the decree was not reflective of the trial exhibit that was marked and received into evidence. According to the interlineated exhibit received at trial, Philip was to have parenting time every other Saturday from 10 a.m. to 5 p.m., not every Saturday. Tammy requested that the court attach the correct proposed parenting time exhibit to the decree.

On October 29, 2020, Philip filed a motion to reopen trial, raising many of the issues asserted in his motion to alter the judgment or, alternatively, for a new trial.

An evidentiary hearing was held on November 17, 2020, on the pending motions. The evidence from the hearing will be set forth as necessary in our analysis. In its order entered on December 3, the district court denied Philip's motion to alter judgment or, in the alternative, for new trial; denied his objection to Tammy's motion to reopen trial; and denied his request to reopen trial. As relevant to this appeal, the court did adopt Tammy's proposed parenting plan, identified as "Exhibit 13" at trial, wherein Philip was to have parenting time every other Saturday from 10 a.m. to 5 p.m., not every Saturday.

Philip appeals.

## III. ASSIGNMENTS OF ERROR

Philip assigns 12 errors, which we have consolidated into three categories. He claims the district court erred in (1) its award of supervised parenting time, (2) its determination of his income for purposes of calculating child support and related expenses, and (3) its division of the marital assets.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[3] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

## V. ANALYSIS

### 1. Supervised Parenting Time

Philip argues that the district court erred when it awarded him limited supervised parenting time. His assigned errors specify problems with "supervision by someone not living in the central United States," not hearing from Josie, and "not allowing the trial to be reopened for further evidence after the filing of an ex parte [motion] by . . . Tammy" and "ruling before hearing rebuttal evidence in regard to such ex parte [motion]."

While Philip assigned error to "supervision by someone not living in the central United States," he did not address this in the argument section of his brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). However, although she does not cross-appeal, Tammy also addresses this issue in her brief. She proposes that we remand "the sole issue of *who* the supervisor is" because "[a]t trial, it was learned that Shaul Mediation is no longer in business." Brief for appellee at 18 (emphasis in original). In its decree, the district court identified "Shaul Mediation" as an appropriate agency to supervise parenting time and stated that "the parties may agree on another appropriate person or agency." Therefore, if the parties are unable to agree, they have the option of filing a motion in the district court to ask the court to identify another appropriate person or agency to supervise Philip's parenting time.

We now address the errors argued by Philip related to supervised parenting time: The district court did not hear from Josie, and it ruled on parenting time before hearing rebuttal evidence in response to Tammy's ex parte motion.

### (a) Evidence at Trial

At the time of trial, Tammy was 45 years old, Philip was 44 years old, Josie was nearly 15 years old, and Jacob was 5 years old.

Tammy testified that during the marriage, Philip threatened her about what would happen if she were to file for divorce. She stated that in 2017, "he threatened that he would slice my throat if he got divorce papers," and in 2020, he threatened to "drag it out." He has also told her that he would make her life hell. Tammy confirmed that Philip had threatened her in front of the children: "He's threatened that if there's another man at the house that he would drag him out by his — expletive. He's also said he would slice my throat, he would kill me."

Tammy testified that in the marital home, Philip yelled, made threats, threw "everything from a raw egg to a remote control" at her, pushed her down the stairs, and pushed her when she was running on the treadmill. When asked if the children had been present for any of those incidents, Tammy said, "Yes." She also described an incident of physical violence against her that occurred in December 2019, after she told Philip he needed to leave the marital residence. She said, "[H]e came downstairs after that and he had hit me with his hand across the left side of my face"; the children were "[r]ight around the corner" at the time. Philip tried to get the phone out of Tammy's hand when she was on the phone with a 911 emergency service dispatch operator, and he left before the police arrived. Philip was later charged with third degree domestic assault in relation to the incident. According to Tammy, he pled guilty to the charge. During his testimony, Philip denied assaulting Tammy in front of the children and said the children were sleeping. Philip pled guilty to assaulting Tammy, because "[m]y lawyer told me that the best way to get out of it was to just plead guilty to it and to resolve it." He was also charged with two counts of child abuse by neglect in relation to the incident, but Philip said those charges were dismissed because the children were sleeping.

Tammy filed for, and was granted, a domestic abuse protection order for herself and the children against Philip in February 2020. Tammy texted Philip to let him know that the judge had signed a protection order. Philip's text response,

received into evidence, stated, "The [sic] my children and there's no cops in this world who's going to stop me from seeing my kids I [sic] rather go to [expletive] prison if you think I'm not going to see my kids so you can go [expletive] yourself." He continued, "They're my kids and you're not stopping me from seeing them not a [expletive] judge not a protection order I don't care."

Two days after the protection order was entered, Tammy received texts from Philip that she described as suicidal in nature. The texts, received into evidence, stated, "I can't do this anymore I lost everything I done too much badd it's up and happens to me soon please make sure My kids know that I love them," and "I'll be honest tammy I don't want to live anymore." According to Tammy, Philip, who has bipolar disorder, has been suicidal in the past, but never attempted suicide. She was concerned about how Philip's suicidal ideations could affect the children. During his testimony, Philip acknowledged sending Tammy the text messages. However, he stated, "I would never kill myself. I said some stupid things in my life but I never meant any of it."

Tammy testified that the protection order was still in place for her at the time of trial, but it was no longer in effect for the children. Tammy did not believe that Philip was in compliance with the protection order, because he had contacted her and been at the house when it was not related to the children as required under the protection order.

In June 2020, a criminal complaint was filed charging Philip with violating the protection order on May 21. Tammy's neighbor testified that on May 21, Philip "entered [Tammy's] driveway abruptly and exited his vehicle and he began screaming, I want my stuff, I want my shit, I want my money, you have my money." Philip proceeded to the backyard, and the neighbor followed. When the neighbor told Philip he needed to get the children and go for his visit, Philip accused the neighbor of "sleeping" with Tammy and threatened to "beat the shit" out of the neighbor. Philip "slammed" a motorized

"Vespa-type thing" down three times and it broke, and he shoved the neighbor. The police were called, and a report was made. During his testimony, Philip admitted there was a confrontation with Tammy's neighbor, but denied putting his hands on the neighbor.

Tammy also had a harassment protection order, entered in February 2020, for her and the children against Philip's girl-friend, Wood. Additionally, there was a specific provision in the April temporary custody order prohibiting Philip's "significant other" from being present during his parenting time. However, Tammy observed Wood to be present during Philip's parenting time, including in May. Tammy's cousin also testified to observing Wood with Jacob at Philip's residence on May 14.

Tammy did not believe it was in the children's best interests to be around Wood because Wood "does drugs and she's violent." Tammy said that Philip told her that Wood hit him. In an April 2020 text message to Tammy, Philip stated:

> I'm on my way to the police station to press charges on [Wood] again she came by my apartment is . . . slapping this shoot out of me AC dropped a bunch of drugs turn into drugs into the police and press charges honor but I need you on standby just in case something happens to me.

Philip testified that he has never observed Wood using drugs. He did state that she smashed his car windows and that she was arrested for that in April.

Tammy testified that Philip also has criminal charges pending against him for hit and run, leaving the scene of an accident, and assault; the charges started in December 2019. Philip addressed the additional criminal charges in his testimony. In December 2019, he was charged with third degree domestic assault of Wood, third degree assault of Wood's ex-boyfriend, and leaving the scene of a property damage accident. Philip said the case will go to trial. He claims that Wood's ex-boyfriend tried to attack him, but that he (Philip) was arrested because "they called the cops."

Tammy testified that Josie is a "daddy's girl" and looks out for Philip. If Philip gets arrested, he calls Josie to let her know. Philip admitted telling Josie to call his boss and his family to let them know he was in jail because he did not have everyone's phone number. Tammy stated, "My 14-year-old is checking Omaha arrests every day to see if her dad's arrested."

Tammy described Josie as smart, athletic, accommodating, and a "social butterfly," and Tammy said that they had had a good relationship. However, in the last few months, Josie had been "vindictive and lying." Philip had been "putting a wedge" between Tammy and Josie. In the past several months, Josie called the police three times, "the reason being, [Tammy] took [Josie's] cell phone from her, or [Josie] would make up a lie saying that she fears for her life." Tammy stated that Child Protective Services became involved with the family, but none of the allegations against her had come back as "founded."

Tammy described Jacob as a "sweetheart," and she said that he was very nice when he played with other children and that he shared "up until the last few months." In the last few months, Jacob became destructive, yelled, and threw things. Now Jacob has "a verbal tick, nervous tick." When asked for her opinion as to why Jacob's attitude had shifted, Tammy stated, "Because his father's having him lie to me, and Josie is also supporting those lies, so he's confused." Jacob "gets scared" when he wants to talk to Tammy, because Josie is there and she "will correct him and bring forth the lie." For example, when Tammy asked Jacob if Wood had been present at a visit, he said yes, but Josie denied that Wood had been present at the visit and said that it was a neighbor.

Tammy's mother testified that she was staying with Tammy in February 2020 and heard Philip yelling at Tammy over a speakerphone; the children were present too. Since then, Josie has been "very short and rude," even though "[s]he never used to be that way." And after a visit with Philip, Jacob said, "My dad's going to bust you, Grandma." When she told him that

was not nice, Jacob said, "'You mother,' [and then] caught himself [and stopped]." Tammy's mother stated, "These are things that that little boy would never ever have said to me."

Tammy believed Philip involved the children in the divorce, particularly Josie. Philip denied talking to the children about the divorce. He said he did not answer Josie's questions when she asked about the divorce, but he did use Josie as a messenger to communicate with Tammy.

Tammy wanted Philip's parenting time to be supervised because he was "breaking the protection order" by having Wood in the children's presence. Tammy was also worried about "possible drug use"; she stated that in November 2019, Philip tested positive for opioids. Tammy proposed that Philip have supervised parenting time one weekday every week after school and every other Saturday.

Philip testified that he was making efforts to improve and that he signed up for an anger management class "yesterday." He also testified that he was in jail for 10 or 11 days prior to his July 2020 testimony and that he tested negative for drugs just prior to his arrest. He proposed joint legal and joint physical custody with "50/50" parenting time.

(b) No In Camera Interview With Josie

Prior to trial, Philip filed a motion asking the district court to conduct an in camera interview with Josie; Tammy objected. At the time of trial, Josie was nearly 15 years old. After Tammy rested her case, Philip's counsel stated, "Your Honor, while we were at lunch, the bailiff mentioned to us that you might be considering an in camera for later today?" The court responded, "I don't know if it's going to be later today, but, yes. And we'll discuss that when we're done. Probably it won't be later today . . . ."

Philip was the only witness called to testify on his behalf. During his testimony, the following colloquy was had on the record.

> [Philip's counsel:] Now, it sound[s] like the Judge is going to — we had filed a motion to have your daughter

be heard. Your daughter actually delivered a handwritten note that she was hoping the Judge would look at; correct?

[Philip:] Yes.

Q. And she gave that to you; correct?

A. Yes.

[Philip's counsel:] Now, Judge, I don't know. If I may, just as a matter of protocol, or whatever. . . . I don't know if you would consider a document that she had prepared in this regard or not, but . . . .

THE COURT: Have you shown it to [opposing counsel]?

[Philip's counsel:] I have not.

. . . .

[Philip's counsel:] I was going to lay some more foundation and then I was going to offer it.

. . . .

[Philip's counsel:] Now, even though you know of this document, you've seen this document, you haven't actually read it; correct?

A. No.

Q. Your daughter prepared it, and you actually dropped it by my office one day?

A. Yes.

. . . .

Q. And she presented it to me; correct?

A. Yes.

Q. And without saying exactly what she wanted, it was important to your daughter that somehow or another her wishes be heard by the Court or understood by the Court?

A. Yes.

Q. And this is the document you know she presented to me on that day?

A. Yes.

[Philip's counsel:] We'd offer this as an exhibit [86].

. . . .

[Tammy's counsel:] I would object on the grounds of foundation, hearsay, relevance. . . . [I]t's clear that Josie is intending for this letter in 86 to be her testimony . . . .

THE COURT: Well, you've had an opportunity to review this exhibit so you understand what the testimony issue is. What I'm going to let both of you do — and I think it's important that we would have it — is actually submit questions that you want me to ask her in the in camera interview. So why don't — I'll go ahead and receive this, and why don't you prepare those for me and we'll figure out when you can get them to me before I actually see her.

At the end of his counsel's redirect examination, Philip was asked if he still wanted the district court to talk to Josie to see what she wants and if the court found she was mature and credible to take her statements into consideration. Philip responded, "Yes." And on recross-examination, Philip confirmed his belief that it was in the children's best interests for the court to speak with Josie.

At the conclusion of Philip's case, his counsel asked the court if it wanted counsel to set up a time for the court to speak to Josie. The court told the parties and their counsel that they were to decide how they wanted to get Josie there and who was going to do it and that the court then would have someone contact that person and make an appointment. It was also decided that each counsel would submit questions.

The district court apparently never conducted an in camera interview of Josie before entering its decree. Philip asserts that because the court did not interview Josie, it did not have "the information needed to fully evaluate the best interests of the child as outlined" in Neb. Rev. Stat. § 43-2923 (Reissue 2016). Brief for appellant at 17.

[4] In determining custody and parenting arrangements, the court is to consider the best interests of the minor child, one such factor of which is "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of

chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). See, also, *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). In those cases where the child's preference was given significant consideration, the child was typically over 10 years old. See, *Vogel v. Vogel, supra*; *Smith v. King, supra*.

Even though the district court did not conduct an in camera interview of Josie, it did have exhibit 86, Josie's 3½ page handwritten note with "testimony" written at the top of the first page. Josie wrote, "From my eyes it feels like only my dad truly wants me and my brother." She continued, "[O]verall im [sic] hoping for 100% with my dad and visitations with my mom or 50/50 custody." She explained her reasoning, portrayed her father in a positive light, and portrayed her mother in a negative light. Under the circumstances, exhibit 86 was sufficient to assess Josie's "desires and wishes" for purposes of § 43-2923(6)(b). Moreover, given that Josie's statements overwhelmingly favored Philip, we cannot say he was harmed or prejudiced by the court's failure to interview Josie.

### (c) Ex Parte Information

Philip argues that the district court "failed to protect the best interest of the minor children when it reviewed ex parte information submitted . . . by Tammy and issued a ruling on custody before hearing evidence in response to such ex-parte [information]." Brief for appellant at 17. Philip "believed that if the Court had been privy to [the rebuttal] information before it entered it's [sic] decree," which "was entered after reviewing the ex parte information, it would have ruled differently." *Id.* at 19.

Trial concluded on July 16, 2020. On October 5, Tammy filed a verified motion for an ex parte order, citing juvenile

court proceedings regarding Philip's newborn twins and asking the district court to require that Philip's parenting time with Josie and Jacob be supervised and that Wood continue not to be present during any supervised parenting time. On October 6, the district court granted Tammy's motion for an ex parte order and set the matter for hearing on October 22. The district court's decree was entered on October 14, awarding Tammy legal and physical custody of the children, subject to Philip's supervised parenting time. On October 20, Philip filed a motion to alter the judgment or, alternatively, for a new trial. And on October 29, he filed a motion to reopen trial.

A motion to reopen can be considered a motion for new trial based on newly discovered evidence, if timely filed. See *Yost v. Davita, Inc.*, 23 Neb. App. 482, 873 N.W.2d 435 (2015), *modified on denial of rehearing* 23 Neb. App. 732, 877 N.W.2d 271 (2016) (party asked trial court to reopen record, accept newly discovered evidence, and reconsider its prior decision based upon belief that new evidence would bring different result; trial court properly treated motion to reopen evidence as motion for new trial). See, also, Neb. Rev. Stat. § 25-1144.01 (Reissue 2016) (motion for new trial shall be filed no later than 10 days after entry of judgment). Philip's motion to reopen was not timely filed, because it was filed more than 10 days after the entry of the decree. However, Philip's October 20, 2020, motion to alter the judgment or, alternatively, for a new trial, was timely filed and preserved issues regarding ex parte information from Tammy's motion.

A hearing on Philip's motion to alter the judgment or, alternatively, for a new trial was held on November 17, 2020. At that hearing, the district court heard testimony from various witnesses called by Tammy and Philip.

Philip's only witness was Angella Murtaugh, a family support worker in the juvenile case involving Philip's twins. She was assigned to be Philip's family support worker on October 13, 2020, and she also covered some of his visits with the twins. She met with Philip "probably twice a week for the

last couple of weeks." Murtaugh stated that Philip "checked off everything that he was asked or suggested to do" and that he even started doing that before Murtaugh began working with him. He was taking domestic violence classes, and a hair follicle test in October showed he had been drug free for 6 months. Murtaugh stated that Philip was a good father and that there was nothing troubling in his interactions with the twins. She also saw Philip with Josie and Jacob, who were present during one of Philip's visits with the twins. Murtaugh stated that it seemed like Josie and Jacob had a great relationship with Philip that "would be very much hurt by the fact that they cannot see their dad anymore."

Following Murtaugh's testimony, Tammy called a number of witnesses. She called a child and family services specialist who testified that Philip's twins tested positive for amphetamines at birth and that during her investigation, Josie and Jacob were interviewed and Jacob indicated possible substance use by Philip. Tammy subpoenaed Wood to testify. Wood acknowledged that she has a history of drug use, the twins tested positive for amphetamines when they were born, and she and Philip currently resided together. Tammy also testified, stating that since the last day of trial, Wood had been around Josie and Jacob. Tammy was concerned for her children's safety and wanted Philip's parenting time to be supervised. Philip also testified that he was not doing drugs and that he had clean hair follicle tests and completed two urine tests each week. He indicated his impression was that he was going to get custody of his twins "shortly after December."

In his brief, Philip argues that Murtaugh's testimony would have caused the district court to rule differently if it had been privy to such before it entered its decree. Tammy counters that "Philip was not unfairly prejudiced or deprived of any substantial right as a full evidentiary hearing was conducted on November 17, 2020," and that "Philip had the opportunity to be heard in response to [her ex parte] motion." Brief for appellee at 20. She notes that the "District Court considered

the evidence by way of testimony, exhibits, and arguments of counsel, and it chose not to grant a new trial or alter or amend its rulings as to parenting time." *Id.* We agree with Tammy that the district court had the opportunity to amend its decree after considering this additional evidence and chose not to do so. Given the evidence before it, we now consider the court's decision to order supervised parenting time before and after hearing this additional evidence.

### (d) Was Supervised Parenting Time Abuse of Discretion?

Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Bornhorst v. Bornhorst*, 28 Neb. App. 182, 941 N.W.2d 769 (2020). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[5] When a court is required to develop a parenting plan, Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) permits limitations to parenting time or other access for a parent if the preponderance of the evidence demonstrates the parent has, among other things, "committed child abuse or neglect," committed "domestic intimate partner abuse," or "interfered persistently with the other parent's access to the child." If a parent is found to have engaged in such activity, "limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." *Id.* Further, the limitations permitted by § 43-2932 include, but are not limited to, "allocation of sole legal custody or physical custody to one parent"; "[s]upervision of the parenting time, visitation, or other access between a parent and the child"; "[e]xchange of the child between parents through an intermediary or in a protected

setting"; "[r]estraints on the parent from communication with or proximity to the other parent or the child"; "[d]enial of overnight physical custodial parenting time"; and "[a]ny other constraints or conditions deemed necessary to provide for the safety of the child, a child's parent, or any person whose safety immediately affects the child's welfare." See, also, *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001) (although limits on visitation are extreme measure, they may be warranted where they are in best interests of children; supervised visitation for mother required until she can make satisfactory showing she is able to provide safe and stable environment for unsupervised visitation with her children consistent with their best interests).

We conclude supervised parenting time is supported by the evidence. Tammy testified about Philip's verbally and physically abusive behaviors. Tammy said Philip "threatened that if there's another man at the house that he would drag him out by his — expletive. He's also said he would slice my throat, he would kill me." In the marital home, Philip yelled, made threats, threw "everything from a raw egg to a remote control" at Tammy, pushed her down the stairs, and pushed her when she was running on the treadmill. Tammy confirmed that the children had witnessed some of the aforementioned incidents. She also described an incident of physical violence against her that occurred in December 2019, when Philip "came downstairs . . . and he had hit [her] with his hand across the left side of [her] face," while the children were "[r]ight around the corner." Philip was later charged with third degree domestic assault in relation to the incident, and he pled guilty. Tammy filed for, and was granted, a domestic abuse protection order against Philip in February 2020. And Tammy's mother testified that she was staying with Tammy in February 2020 and heard Philip yelling at Tammy over a speakerphone; the children were present, too.

Philip was also involved in a physical altercation with Wood and her ex-boyfriend that resulted in a criminal charge

against Philip. And there was evidence that Philip allowed Wood to be around Josie and Jacob, despite a harassment protection order and the temporary custody order prohibiting Wood from being present during his parenting time. At the hearing in November 2020, Wood testified that she and Philip currently resided together.

The evidence of Philip's verbal threats and physically abusive behaviors toward Tammy, along with his altercation with Wood and her ex-boyfriend, and of Philip's allowance of Wood to be around Josie and Jacob despite court orders that prohibited Wood's presence around the children certainly supports supervised parenting time. Additionally, there is evidence suggesting Philip has been improperly influencing the children against Tammy, which has caused a negative change in the children's attitudes and behaviors toward her and at least one other relative. This type of alienating behavior also supports supervised parenting time.

Despite Josie's handwritten note, based upon the evidence in the record before us, including the testimony from the hearing on November 17, 2020, we cannot say the district court abused its discretion by ordering that Philip have supervised parenting time. Supervised parenting time does not need to be a permanent situation; the ability to return to more typical parenting time is within Philip's control. Once he can demonstrate that he will conduct himself in an appropriate manner and will parent his children focused on their best interests, adjustments can be made to his parenting time. Upon proper evidence presented to the court, a parenting plan is subject to modification. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016) (right of parenting time is subject to continuous review by court, and party may seek modification of parenting time order on grounds there has been material change in circumstances; best interests of children are primary and paramount considerations in determining and modifying parenting time).

## 2. Child Support

Philip asserts that the district court erred by attributing an income to him that was not supported by the evidence. Additionally, he asserts that the division of childcare and uncovered medical expenses was not in accord with the Nebraska Child Support Guidelines.

### (a) Total Monthly Income

#### (i) Evidence at Trial

Tammy works as a patient service representative at a pediatric clinic. She earns approximately $3,484 gross per month. Tammy testified that Philip works construction and earns over $60,000 per year through his current employer, a property company. Additionally, Philip does "side work . . . for realtors" and extra construction work. She said that he earns extra money from side jobs that "is not traceable by W-2s or 1099s."

Philip testified that he is in the construction field. He is employed by a property company and "[r]emodels, flip[s] houses for them." He is "self-employed through the company" and is paid weekly, but taxes are not taken out. He stated that he is "salary, so they don't pay anything extra"; "they give you a contract, they give you a deadline from this date to this date"; and "[i]f you don't have your job done by that date, you're working for free until the job is done." He denied earning $60,000 per year in the past 3 years, from 2017 through 2019.

The parties' tax returns and related documents from 2017 through 2019 were received into evidence as exhibits 14 through 16, respectively. The exhibits reveal the following: In 2017, Philip's "Form 1099-MISC" (1099) from the property company shows that Philip received $40,900 in "Nonemployee compensation." Additional 1099's show that Philip received $2,000 in "Nonemployee compensation" from a sealant company and $1,500 in "Nonemployee compensation" from Joseph Chalifoux. The total amount of "Nonemployee compensation" Philip received from the three payors was $44,400.

Philip's Schedule C "Profit and Loss From Business (Sole Proprietorship)" (Schedule C) shows "Gross receipts or sales" of $44,400. No depreciation was deducted; however, $38,353 in various expenses was deducted, including $3,540 for car/truck expenses and $23,385 for "Supplies" that are not counted as cost of goods sold. The net profit reflected on the schedule was $6,047. This $6,047 is what was reported as "Business Income" on the parties' federal individual income tax return.

In 2018, Philip's 1099 from the property company shows that Philip received $65,218.12 in "Nonemployee compensation." An additional 1099 shows that Philip received $1,200 in "Nonemployee compensation" from Chalifoux. The total amount of "Nonemployee compensation" Philip received from the two payors was $66,418. Philip's Schedule C shows "Gross receipts or sales" of $66,418. No depreciation was deducted; however, $21,486 in various expenses was deducted, including $9,116 for car/truck expenses and $7,159 for "Supplies" that are not counted as cost of goods sold. The net profit reflected on the schedule was $44,932. This $44,932 is what was reported as "Business Income" on the parties' federal individual income tax return.

In 2019, Philip's 1099 from the property company shows that Philip received $58,860 in "Nonemployee compensation." An additional 1099 shows that Philip received $1,240 in "Nonemployee compensation" from Chalifoux. The total amount of "Nonemployee compensation" Philip received from the two payors was $60,100. Philip's Schedule C shows "Gross receipts or sales" of $60,100. No depreciation was deducted; however, $29,161 in various expenses was deducted, including $16,194 for car/truck expenses and $6,433 for "Supplies" that are not counted as cost of goods sold. The net profit reflected on the schedule was $30,939. This $30,939 is what was reported as "Business Income" on the parties' federal individual income tax return.

Philip wanted the district court to average his last 3 years of income for purposes of calculating child support, although

he acknowledged 2017 was not a full year of work (he did not elaborate) and thus factored that in his proposed calculation. Philip agreed that he earned about $38,000 per year "after everything has been deducted." Philip's proposed child support calculation was based on his earning approximately $38,000 gross annually and resulted in a child support obligation of $645 per month for two children. In the past, "[w]hen stuff was really busy," he made $15,000 to $20,000 extra from "side work." He agrees that he is capable of making additional money from "side work," but stated that "with the Corona 19 nobody's even calling [him]." He stated that he "put [his] phone number out there and Tammy took that phone away, so nobody knows who [he is] anymore."

The parties agree that Philip cannot read or write very well and that in the past, Tammy helped Philip fill out job applications. Although Philip did not graduate from high school, Tammy testified that his "skill set is a higher paying job" than hers; she has an associate degree in hotel/motel management.

### (ii) District Court's Ruling

The district court found that Tammy's taxable monthly gross income was $3,484.10 based on her recent paystubs and that Philip's taxable monthly gross income was $5,008.33 based on his 2019 tax returns; the court did not average Philip's past incomes. The court further found that Philip "has the annual earning capacity of at least $60,000.00 per year." The court imputed the foregoing monthly gross incomes in its child support calculation worksheet. In accordance with the court's child support calculation, Philip was ordered to pay child support in the amount of $998 per month for two children.

### (iii) Did District Court Abuse Its Discretion?

Philip does not dispute the income attributed to Tammy. However, he argues that the income attributed to him "was in no way supported by the evidence." Brief for appellant at 19. Philip asserts that the exhibits received into evidence show his 3-year income average from 2017 through 2019 was around

$27,000 per year, but he "believes that a fair number to use would be $36,000." *Id*. at 20. We note that at trial, Philip stated he earns about $38,000 per year "after everything has been deducted," and he used that amount in his proposed child support calculation, which was received into evidence; his proposal resulted in a child support obligation of $645 per month for two children. Tammy asserts that the district court did not abuse its discretion when it imputed Philip with an annual earning capacity of $60,000.

[6,7] The main principle behind the Nebraska Child Support Guidelines is to recognize the equal duty of both parents to contribute to the support of their children in proportion to their respective net incomes. See Neb. Ct. R. § 4-201. Before determining a parent's child support obligation, there must be a determination regarding the monthly incomes of the custodial and noncustodial parents. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). As a general rule, the income of a self-employed person can be determined from his or her income tax return. *Id*.

Total monthly income is the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. Neb. Ct. R. § 4-204(A) (rev. 2020). This would include income that could be acquired by the parties through reasonable efforts. *Id*. Section 4-204(E) states:

> If applicable, earning capacity may be considered in lieu of a parent's actual, present income. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. When imputing income to a parent, the court shall take into consideration the specific circumstances of the parents, to the extent known. Those factors may include the parent's residence, employment and earnings history, job skills, educational attainment, literacy, age, health, and employment barriers, including criminal record, record of seeking work, prevailing local earning levels, and availability of employment.

However, in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged. See Neb. Ct. R. ch. 4, art. 2, worksheet 1, n.5 (rev. 2016). See, also, *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007) (3-year average to be used when averaging income).

Philip acknowledged that he did not have a full year of work in 2017. Accordingly, it would not have been appropriate to average his income for that year into a 3-year average. And in looking at Philip's gross receipts in 2018 ($66,418) and 2019 ($60,100), the slight difference in numbers does not reflect the kind of substantial fluctuations of annual earnings that might warrant income averaging. In this case, the district court attributed a $60,100 annual income to Philip and specifically referenced the parties' 2019 tax return, as well as Philip's earning capacity. In 2019, Philip's gross receipts as a sole proprietorship were $60,100 before deductions for expenses.

Arguably, it may have been an abuse of discretion to use Philip's gross receipts to determine his income, since there were business expenses identified that reduced those gross receipts to a taxable net profit of $30,939. However, the district court may not have been persuaded that all deductions reflected in the parties' Schedule C supported reducing Philip's income for child support purposes. For example, in 2019, Philip deducted $16,194 in car/truck expenses, while in the previous year, that amount had only been $9,116, even though Philip's 2018 gross receipts were higher at $66,418 (net profit of $44,932). In both of those tax years, the car/truck deductions correlated with mileage associated with using vehicles for business; in 2019, Philip reported that two vehicles were driven a combined 27,921 miles for business use, and in 2018, he reported that one vehicle was driven 16,726 miles for business use. There was no evidence adduced as to why there was such a significant increase in mileage associated with Philip's work in 2019, nor any further information provided about why a second vehicle was claimed in 2019. In both years, the tax

returns reflect that these vehicles were also driven for personal use.

Regarding Philip's reported deductions, his attorney began to question Philip about his "suggestion" that the district court use a higher income for child support purposes than reflected by the average of his net profits because he was able "to deduct [his] truck and some other expenses like that, that if you weren't self-employed, you wouldn't be able to deduct?" Unfortunately, before Philip could answer, an objection was made to the form of the question, and when the question was asked again, it was stated differently. However, Philip did acknowledge the impact of such deductions on his taxable income. When he was later asked on cross-examination if "expensing more reduces the profit [he] gets[?]" Philip responded, "Yes." Although this line of questioning could have been more fully developed, the district court could have determined that the mileage expenses Philip was declaring on the parties' tax returns should not detract from Philip's earning capacity when calculating his responsibility for child support, especially when the vehicles were being used for work and personal purposes.

Perhaps more important, Philip also testified that in the past, he made $15,000 to $20,000 per year from "side work," which is not reflected in the parties' tax returns as business or other income. There is simply no way to confirm precisely how much Philip earned in unreported "side work," but it would have been appropriate for the court to include an additional $20,000 in earning capacity based upon Philip's own testimony. A party's total monthly income from all sources must be considered for purposes of child support. See § 4-204(A). Therefore, when considering Philip's reported gross receipts of greater than $60,000 for 2 consecutive years, plus up to $20,000 in other unreported "side work" income, we cannot say that the district court abused its discretion in determining that Philip has an earning capacity of at least $60,000 per year.

(b) Allocation of Medical and Daycare Expenses

The entirety of Philip's argument on this alleged error consists of one sentence: "When applying the income averaging approach, [Philip] also requests that the Court assign a proportionate division of uncovered medical expenses and daycare costs." Brief for appellant at 20. Because we have already determined the district court did not abuse its discretion in determining Philip's earning capacity to be $60,000 per year, we need not further address Philip's assignment of error regarding the division of uncovered medical expenses and daycare costs.

Although not raised by either party, we do note that paragraph 19 of the decree first indicates that Tammy "shall be responsible for paying the first $250.00 per child, per calendar year of all non-reimbursed health care expenses, which are reasonable and necessary." However, it then says, "After the threshold amount of $250.00 *per month*, per calendar year, per child has been met [Tammy] shall pay 40% and [Philip] shall pay 60% of all non-reimbursed reasonable and necessary health care costs for the minor children." (Emphasis supplied.) The "per month" language is clearly a scrivener's error in light of the first sentence in the paragraph, as well as the applicable rule. See Neb. Ct. R. § 4-215 (rev. 2020) (portion of all non-reimbursed reasonable and necessary children's health care costs in excess of $250 *per child per year* may be allocated to the obligor parent). As a matter of plain error, we modify the language of the decree to conform with § 4-215 by striking the words "per month." See *Tyler F. v. Sara P.*, 306 Neb. 397, 945 N.W.2d 502 (2020) (plain error exists where error, plainly evident from record, prejudicially affects substantial right of litigant and is of such nature that left uncorrected would cause miscarriage of justice or result in damage to integrity, reputation, and fairness of judicial process).

### 3. PROPERTY DIVISION

At trial, both parties offered testimony and evidence regarding the marital and premarital nature of certain assets, the

value of the various marital assets and debts, and how each party proposed allocating specific assets and debts.

Philip claims that the district court did not (1) value the marital property retained by each party as supported by the evidence, (2) award him his equitable interest in the marital home, (3) allocate the proceeds from the sale of a camper between the parties, and (4) properly divide Tammy's "Fidelity Rollover IRA" and "Vanguard 401(k)" to award him his marital portion of such assets, and (5) properly allocate his "Keybank IRA" and his "Machinist Money Pension" (Machinist pension) in its division of the parties' retirement assets. Tammy argues that "[w]hat Philip is asking this Court to do is reverse the District Court and essentially implement a piecemeal division of the marital assets without taking into consideration the marital debts." Brief for appellee at 23. Tammy asserts that "[her] proposal [exhibit 55] balances the entire marital estate," *id.*, and that the "District Court largely adopted [her] proposed division, except it did not order either party to pay a property settlement payment to the other," *id.* at 25.

[8-10] In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck v. Jeanette, supra.* The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id.* Although the division of property is not subject to a precise mathematical formula, the general rule is to award a spouse one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

The district court seemingly adopted Tammy's proposed division of the marital estate as set forth in exhibit 55, and we cannot say it was an abuse of discretion for the court to rely on the values and allocation of assets and debts presented in that document. However, there does appear to be another scrivener's error in that Philip's Machinist pension, specifically identified by both parties on their respective exhibits, was not set forth in paragraph 25 of the decree pertaining to retirement accounts; we therefore modify that paragraph to include the Machinist pension as being awarded solely to Philip.

Philip's remaining alleged errors regarding the valuation and division of the marital estate ultimately relate to no equalization being paid to him despite a greater portion of the marital estate being paid to Tammy. Using Tammy's values and proposed division as set forth in exhibit 55, Tammy was allocated $319,919 in marital assets and Philip was awarded $53,950 in marital assets. Tammy was allocated marital debts totaling $204,596, and Philip was allocated marital debts totaling $3,987. Therefore, Tammy's net marital estate was $115,323 and Philip's was $49,963 (total net marital estate equals $165,286). There is a difference of $65,360, which would typically be divided in half to reach an equalization amount. In this case, Tammy would owe $32,680 to Philip as a marital equalization amount if the goal was to reach a perfect 50-50 equalization. However, in this case, as calculated above, the district court was apparently satisfied that Tammy would receive approximately 70 percent of the net marital estate and Philip would receive approximately 30 percent. Although this division does not quite fit within the general rule of awarding a spouse one-third to one-half of the marital estate, see *Millatmal v. Millatmal, supra*, it is close enough that we cannot say that the award was an abuse of discretion. We therefore affirm the district court's division of the marital estate.

However, we do note that exhibit 55 reflects that the proceeds from the sale of the camper were allegedly divided equally between the parties, but Philip's brief suggests that

division has not taken place. To the extent it has not, the decree is further modified to clarify that Tammy must pay Philip the $3,425 for his one-half share of the camper proceeds as reflected in exhibit 55.

## VI. CONCLUSION

For the reasons stated above, we affirm the decree in all matters, except for (1) modifications to correct scrivener's errors in paragraph 19 of the decree regarding nonreimbursed health care expenses for the children and paragraph 25 of the decree to reflect the award of the Machinist pension to Philip and (2) a modification to clarify that Tammy must pay Philip $3,425 for his one-half share of the camper proceeds, if she has not done so already.

AFFIRMED AS MODIFIED.