Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/03/2025 09:09 AM CDT

Tyson R. Larson, appellant, v.
Haley M. Larson, appellee.
___ N.W.3d ___

Filed May 20, 2025.    No. A-24-220.

1.  **Judges: Recusal.** A recusal motion is initially addressed to the discretion of the judge to whom the motion is directed.
2.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a district court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3.  **Pretrial Procedure: Appeal and Error.** Generally, the control of discovery is a matter for judicial discretion, and decisions regarding discovery will be upheld on appeal in the absence of an abuse of discretion.
4.  **Pretrial Procedure: Proof: Appeal and Error.** The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion.
5.  **Divorce: Modification of Decree: Child Custody: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a dissolution action or modification of a decree related to child custody, visitation, or support, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees.
6.  **Judges: Recusal.** To demonstrate that a trial judge should have recused himself or herself, the moving party must show that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown.
7.  **Judges: Recusal: Presumptions.** There exists a presumption of judicial impartiality, and a party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming that presumption.

8. **Courts: Records.** It is not the duty of a court to scour the record in search of facts that might support a claim.

9. **Trial: Pretrial Procedure: Pleadings: Evidence: Juries: Appeal and Error.** A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court.

10. **Pretrial Procedure: Pleadings: Appeal and Error.** An appellant who has assigned only that the district court erred in denying a motion in limine has not triggered appellate review of the evidentiary ruling at trial.

11. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error.

12. ____. Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error.

13. ____. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

14. **Modification of Decree: Child Custody: Proof.** Custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action.

15. ____: ____: ____. It is the burden of the party seeking modification to show a material change in circumstances. Specifically, the movant must show two elements: First, that since entry of the most recent custody order, there has been a material change in circumstances that affects the child's best interests, and second, that it would be in the child's best interests to change custody.

16. **Child Custody.** Consideration of the child's best interests involves a combination of both mandatory and permissive factors. No one factor is dispositive, and various factors may weigh more or less heavily, depending on the case.

17. ____. Courts typically do not award joint legal custody when the parties are unable to communicate effectively.

18. ____. Where the parties are unable to communicate and trust one another, joint decision making by the parents is not in the child's best interests.

19. **Child Support: Rules of the Supreme Court.** In general, child support payments should be set according to the guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 2016). However, the trial court

may deviate from the guidelines whenever the application of the guidelines in an individual case would be unjust or inappropriate.

20. ____: ____. The child support guidelines do not provide for an automatic deduction for the support of children of subsequent marriages. Instead, the guidelines provide that credit *may* be given for biological or adopted children for whom the obligor provides regular support.

21. **Appeal and Error.** A trial court cannot err in failing to decide an issue not raised, and an appellate court will not consider an issue for the first time on appeal that was not presented to or passed upon by the trial court.

22. ____. The district court cannot err by failing to consider something not in the record.

23. **Attorney Fees.** Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

24. ____. Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

25. **Divorce: Attorney Fees.** A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.

26. ____: ____. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Douglas County: LeAnne M. Srb, Judge. Affirmed.

Jeffrey A. Wagner, of Wagner Meehan, L.L.P., for appellant.

Kelly T. Shattuck, of Vacanti | Shattuck | Finocchiaro, for appellee.

Riedmann, Chief Judge, and Pirtle and Arterburn, Judges.

Pirtle, Judge.

### I. INTRODUCTION

Tyson R. Larson and Haley M. Larson were divorced in March 2016 in the district court for Holt County, Nebraska. Following their divorce, Haley struggled with substance

abuse and mental health problems. By December 2016, Tyson had moved to Omaha, Nebraska, and Haley was residing in Fremont, Nebraska. The case was transferred to the Douglas County District Court, and Tyson filed a complaint to modify the decree. As a result, Tyson was given primary custody of their son, Theodore Larson (Theo). During this time, Theo grew to resent Haley and refused to go on visitations with her.

After a trial on Haley's amended motion to modify the divorce decree, the district court awarded her joint physical custody and sole legal custody of Theo. It also ordered Tyson to pay Haley $20,000 in attorney fees and $759 per month in child support. Tyson now appeals those determinations, two of the court's pretrial decisions, and the court's refusal to recuse itself. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. Pretrial Proceedings

Tyson and Haley were married in October 2011 and are the biological parents of Theo, born in February 2012. Pursuant to the divorce decree, they initially had joint custody of Theo, with Haley having primary physical custody subject to Tyson's parenting time. But in late December 2016, Tyson filed a complaint for modification after Haley's mother informed him that Haley was struggling with her mental health. An order of modification was entered on October 5, 2017, that gave Tyson sole physical and legal custody of Theo. Pursuant to this order, Theo primarily lived with Tyson but stayed with Haley every other weekend.

At some point in late 2018, Haley lost her health insurance. Without insurance, she was no longer able to afford her mental health medication. As a result, she began to self-medicate with marijuana, methamphetamine, and alcohol. This had an obvious impact on her ability to parent Theo.

On May 10, 2019, due to concerns with Haley's mental health, Tyson filed a complaint for modification requesting that Haley be supervised during her parenting time. He also

filed a motion for an ex parte order to terminate her parenting time. This motion was granted, and Haley's parenting time was suspended pending a further hearing.

On October 2, 2019, the court issued an order that determined Haley's "significant mental health and substance abuse issues" warranted a custody modification. This order suspended Haley's visitation rights and granted Tyson sole legal and physical custody of Theo. The order then set forth a five-step progressive plan that outlined how Haley could reestablish her visitation rights. These steps generally required that Haley enroll in counseling, pass hair follicle drug tests, not be involved in any criminal proceedings, and have a stable living environment. If she was able to abide by those requirements for certain periods of time outlined by the plan, she would progress to the next step and have less restrictive visitations with Theo.

On November 9, 2019, Haley sent an email to Tyson requesting to speak to Theo or schedule a supervised visit with him. Tyson responded the same day and notified Haley that if she wanted to see Theo, she would have to abide by the terms of the October 2 order. Haley then went a year without contacting Tyson or Theo. By all accounts, Haley was using drugs during a portion of this time, but identified July 29, 2020, as the date she became sober. Once sober, Haley began participating in a day program at Community Alliance, a local nonprofit that provided her mental health treatment and substance abuse rehabilitation. She also started to attend meetings with Alcoholics Anonymous, Narcotics Anonymous, and "Dual Recovery Anonymous," a program that assists addicts who also struggle with mental health problems.

On November 21, 2020, Haley emailed Tyson, informing him that she completed the necessary requirements to reach the first step of her progressive plan. With this, she requested to begin the visitations with Theo allowed under that step. Notably, this email was Haley's first attempt to contact Tyson or Theo since the November 9, 2019, email exchange.

However, several months prior, in July 2020, Tyson and his new wife, Brittany Brockway (Brittany), had filed a petition for a stepparent adoption of Theo. In this petition, Tyson alleged that Haley had abandoned Theo and that Brittany's adopting him was in his best interests. Haley learned of the adoption proceedings in December and contested the adoption. After a trial was eventually held in March 2021, the court determined that Tyson and Brittany had failed to establish that Haley abandoned Theo. Accordingly, the court denied the adoption. Tyson and Brittany appealed that decision to the Nebraska Court of Appeals, and we affirmed the county court's ruling on February 8, 2022. See *In re Adoption of Theodore L.*, No. A-21-331, 2022 WL 363740 (Neb. App. Feb. 8, 2022) (selected for posting to court website). Tyson and Brittany then petitioned for further review by the Nebraska Supreme Court, which petition was denied on July 5, 2022.

On January 5, 2021, while the adoption case was still pending, Haley filed for an order to show cause that alleged Tyson was preventing her from contacting Theo, although she had completed the necessary requirements to have phone contact with him under the first step of the October 2, 2019, progressive plan.

On April 8, 2021, Tyson filed a complaint to modify the parenting plan that alleged Haley had not had any contact with Theo since April 8, 2019, and that Theo was afraid of her. As a result, Tyson requested Haley's parenting time be altered to ensure Theo's safety and mental well-being. Tyson also filed a motion for an ex parte order requesting Haley's parenting time be suspended or, in the alternative, only occur in a therapeutic setting. On April 15, the court issued two orders. These orders denied Haley's motion to show cause and granted Tyson's motion for an ex parte order. Pursuant to the second order, Haley's parenting time could occur only in a therapeutic setting.

On April 27, 2021, Haley filed her answer to Tyson's complaint to modify and a counterclaim for modification. In her

counterclaim, she alleged that she had refrained from the use of alcohol and drugs for 9 months and requested a less restrictive parenting plan to allow for more parenting time with Theo. On the same date, Tyson filed a motion to dismiss his complaint to modify, which motion was granted on April 28.

On May 19, 2021, the court issued an order that reinstated Haley's parenting time pursuant to the October 2, 2019, order. On June 3, 2021, Haley filed a motion to enforce the October 2, 2019, parenting plan. In this motion, she alleged that Tyson was still restricting her parenting time, although she fulfilled the requirements to progress to the second step of the plan. On June 21, the court granted Haley's motion and ordered Tyson to comply with the October 2, 2019, parenting plan.

On June 19, 2021, 2 days prior to the issuance of the court's order on Haley's motion to enforce, Haley attempted to pick up Theo from Tyson's house for her scheduled parenting time. Haley's mother was present and acting as the supervisor in accordance with the parenting plan. Upon their arrival and entry onto the front porch, Tyson came out and asked that Haley's mother and her other child wait on the sidewalk. A brief verbal conflict ensued, and after Tyson's wife, Brittany, demanded they step off the property, Brittany called the police. The police arrived and monitored the situation as Haley attempted to coax Theo to come with her. During this interaction, Theo continually cried and stated that he did not want to go. After approximately 10 minutes of talking, Brittany was able to convince Theo to go with Haley.

The next day, June 20, 2021, Haley attempted to pick up Theo again for her scheduled parenting time, but he refused to go with her. After around 7 minutes of trying to convince him, she said that he did not have to go and left.

On July 14, 2021, Haley filed another motion to show cause, alleging that Tyson was impeding her relationship with Theo by not encouraging a positive relationship between them. The same day, the court issued an order to show cause. It does not appear that this order was ever resolved.

On July 17, 2021, Haley arrived at Tyson's home to pick Theo up for her scheduled parenting time. Theo initially expressed that he did not want to go but was eventually convinced by Haley to spend half the day with her. Haley attempted one more visit on August 22 but was unable to persuade Theo to go with her. On September 13, Haley filed a motion to compel Tyson to encourage visits, alleging that Tyson was refusing to encourage Theo to go with her during her scheduled parenting time. This motion was denied on October 7.

Haley attempted more visits with Theo on September 18 and 19; October 2, 3, 16, 17, and 31; November 6, 7, and 25; and December 31, 2021. The videos of these attempts are between 1 and 2 minutes long and depict Theo adamantly stating that he did not want to go with Haley. Although Haley attempted to persuade him, he refused each time, and she eventually left the property. Haley made more attempts to pick up Theo on January 7 and 21; February 4 and 18; March 4 and 18; and April 1, 15, and 29, 2022. These attempts all had the same outcomes. In each video, Theo came out of the residence and immediately expressed that he did not want to go with Haley, Haley tried convincing him for 1 or 2 minutes, and then Haley eventually left after Theo still refused. On two occasions, on February 26 and March 5, Haley's father attempted to pick up Theo for her parenting time, but was similarly unsuccessful.

On November 3, 2021, Haley filed an amended counterclaim where she requested custody of Theo or, in the alternative, a return to joint legal and physical custody. Additionally, Haley requested that her obligation to pay child support be terminated, that Tyson pay her child support, and that Tyson pay her attorney fees.

On February 28, 2023, Haley filed a motion for further orders in which she requested an order to address Theo's continued refusal to participate in visitations. A hearing was held on March 16. At this hearing, Tyson made an oral motion for the district court judge to recuse herself due to apparent bias. This motion was denied. At the hearing, the court expressed

general frustration that Tyson was not actively encouraging Theo to spend time with Haley. Additionally, there was much discussion about how to draft an order that specified what the court expected Tyson to do when Theo refused to go with Haley. The next day, March 17, the court issued an order that modified the parenting schedule so that Theo would stay with each parent on a weekly basis. The order also specified that Tyson was responsible for walking Theo up to Haley's door, instructing him that he must go on the visit, and telling him that Tyson wanted him to go on the visit. The order also granted Haley's request for attorney fees related to her motion in the amount of $1,500.

On April 5, 2023, Tyson filed a notice of intention to serve a subpoena on Haley's mother, Krista Clark. This subpoena requested all communications between her, Haley's attorney, Haley, Theo's family therapist, and anyone else that concerned Theo. On May 1, Haley filed an objection to this subpoena, arguing that Tyson failed to follow statutory procedures and was requesting information protected by attorney-client privilege.

On April 11, 2023, Tyson filed an affidavit and application for an order to show cause that alleged Haley had refused to pay the court-ordered child support payments from January 17 through April 3, 2023. The next day, the court issued an order for Haley to appear and show cause as to why she did not abide by the orders of the court.

On June 16, 2023, Tyson filed an amended motion in limine that sought to exclude the testimonies of Haley's expert witnesses, Dr. Kirk Newring and Dr. Alan Blotcky. These expert witnesses were anticipated to testify about "parental alienation" and how Tyson was intentionally undermining Theo's relationship with Haley. Tyson's motion in limine argued that the proposed expert testimonies were based on insufficient reasoning and methodologies under the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993), and *Schafersman v. Agland*

*Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). The motion also alleged that Blotcky's testimony should be excluded as a discovery sanction because his report was filed beyond the deadline.

Hearings on Haley's objection to Tyson's subpoena of Clark and Tyson's motion in limine were held on June 23, 2023. In relation to the subpoena issue, Haley's attorney explained that because Haley and Clark lived together and used the same computer, he always included Clark on any email correspondence with Haley. He then stated that because of this, he instructed Clark to hire him as well so any communications between him, Haley, and Clark were privileged. Tyson's attorney argued that Clark only hired Haley's attorney to prevent the requested information from being disclosed. In an order issued the same day, the court sustained Haley's objection to the subpoena.

As it relates to the motion in limine, Tyson's attorney explained that he had been unable to depose Blotcky and had received his report past the imposed deadline. He then argued that Newring's and Blotcky's opinions regarding parental alienation were based on "junk science" because parental alienation was not a diagnosis under the "DSM-5." Haley's attorney responded that parental alienation is not a diagnosis, but, rather, it is a descriptive form of behavior that can be recognized by experts.

On June 26, 2023, the court issued an order denying Tyson's motion in limine. In this order, the court first excused the late disclosure of Blotcky's report. The court stated that although it was not condoning the discovery violation, Tyson still had the report far in advance of trial. As to the merits of the motion, the court determined that Tyson failed to satisfy his initial burden of sufficiently calling into question the reliability or validity of the anticipated testimony. It stated that although Tyson's motion was labeled as a *Daubert* challenge, it failed to specifically explain why the expert opinions should be excluded. The court then concluded that Tyson's

concerns with the proposed testimony went to the weight of the evidence, not its admissibility, and thus could be explored during cross-examination.

## 2. Trial

A trial on Haley's amended counterclaim for modification and Tyson's motion to show cause concerning Haley's failure to pay child support was held over the course of several days on September 6 and 7 and November 1, 2023, and January 31, 2024. Prior to the start of the second day of trial, Tyson's attorney once again made an oral motion for the district court judge to recuse herself due to apparent bias. The court denied this motion. During the trial, Haley called six witnesses and testified in her own behalf. Tyson called two witnesses, one being Theo, and testified in his own behalf.

### (a) Therapists

Rebecca Cooke is a behavioral health therapist at Community Alliance. She has worked with Haley since November 6, 2020. She stated that she has helped Haley work through her diagnoses of major depressive disorder, generalized anxiety, post-traumatic stress disorder, attention deficit disorder, and history of methamphetamine and cannabis disorders. She said that Haley's primary goal was to better manage and stabilize her mental health symptoms to lower her risk of relapse. Cooke then described the steps Haley has taken to remain sober. She stated that after Haley became sober on July 29, 2020, Haley enrolled with Community Alliance, graduated from the program in February 2022, and has been attending weekly Alcoholics Anonymous, Narcotics Anonymous, and "Dual Recovery Anonymous" meetings. Additionally, Haley graduated from drug court in February 2022 and has been taking medication to help with her mental health symptoms. Given that Haley had been sober for 3 years and continued to take steps to rehabilitate herself, Cooke believed that she was at a low risk of relapse and could safely parent Theo.

Dr. Jamie Pasqua is a clinical psychologist who did reunification therapy for Haley and Theo from June 15, 2021, to June 13, 2022. Pasqua primarily worked with Haley and Theo but met with Tyson on a few occasions. She explained that during the sessions with Haley and Theo, Theo expressed that he was angry with Haley for abandoning him and was worried about the potential of her relapsing. Although Pasqua suggested that Theo's relationship with Haley improved early on, that progress eventually plateaued and Theo struggled to confront the anxiety he experienced when around her.

Pasqua said that Tyson was willing to encourage Theo to reestablish a relationship with Haley, but expressed his concern about forcing Theo to spend time with her when he did not want to. Pasqua explained that she had encouraged Tyson to be honest with Theo about his reservations and had also informed Tyson about the importance of supporting Theo's relationship with Haley. This was difficult for Tyson because he did not want to break Theo's trust by forcing him to build a relationship with Haley when Tyson was unable to promise that she would not leave again.

Sara Batter is a mental health therapist and an alcohol and drug counselor who has piloted family therapy with Theo and Haley since August 2022. Batter stated that she typically works with just Haley and Theo but involved Tyson in a few sessions. She said that Theo was more participatory during the most recent sessions but continued to express that he felt sad and depressed during Haley's parenting time. She believed that Theo was still upset with Haley for leaving and being absent for so long.

Batter indicated that Tyson was at least partially responsible for some of Theo's anger toward Haley. In particular, she said that Tyson's lack of coparenting and communication impeded Theo's relationship with Haley. She also believed that Tyson could speak more positively about Theo's visits with Haley and do more to encourage him when Tyson dropped him off at Haley's house. Overall, Batter said that

Tyson's actions made the therapeutic process more difficult and the drop-offs more problematic.

Lisa Vogel is a mental health therapist who has worked with Theo since December 2020. Although the timing was not clear, at some point, she diagnosed Theo with post-traumatic stress disorder in regard to a traumatic event he experienced while visiting Haley sometime between 2017 and May 2019. She stated that around that timeframe there were several instances when Theo was unable to wake Haley up and felt scared because he did not know if she was alive.

Vogel also discussed Theo's struggles since Haley reentered his life. She explained that, at one point, Theo was making "great, great" improvements, but became more withdrawn once he had contact with Haley. She said that he did not want to spend time with her and became very angry when asked about their relationship. She also talked about how Theo did not believe anyone was listening to him and how he felt sad and depressed during Haley's parenting time. She was particularly concerned that Theo started making comments that he no longer wanted to be alive. Vogel believed that Theo was afraid of Haley and feared returning to the same conditions he experienced with her before. With his comments and expressed feelings of depression, she concluded that the current custody arrangement was not good for Theo.

Given Theo's regressions, Vogel was unsure if he could form a positive relationship with Haley. She did not approve of the approach used by Pasqua or Batter and expressed concern that they did not contact her prior to starting family therapy with him. But unlike the other therapists, Vogel did not believe Tyson was doing anything to keep Theo away from Haley. She thought Tyson was properly encouraging him to reestablish the relationship, but the relationship was plagued by Theo's anger. In terms of a future custody arrangement, Vogel believed that any plan that fully separated Tyson and Theo could cause Theo irreparable harm.

On cross-examination, it was revealed that Vogel's license to practice as a mental health practitioner was put on probation in 2008 for misrepresenting facts on her license renewal application. On the application, Vogel indicated that she had not been convicted of any additional misdemeanors or felonies, although she had been convicted of a second driving under the influence offense. As a result of this disciplinary action, Vogel's license was placed on a probationary status for 5 years and she was ordered to not consume alcohol. However, in 2009, during one of her required body fluid tests, Vogel tested positive for alcohol and admitted to drinking. After a petition to revoke her probation was filed, Vogel agreed to a censure and a $500 fine.

### (b) Parental Alienation

Blotcky is a clinical and forensic psychologist who provided expert testimony regarding parental alienation. He defined parental alienation as "when one parent intentionally tries to undermine and even sever the child's relationship with the other parent." He explained that parental alienation is not a diagnosis but is subsumed under three different possible categories in the "DSM-5." These three categories are "[p]arent-child relational problem," "child affected by parental relationship distress," and "child psychological abuse." He then described a five-factor model diagnosis that outlines the criteria to determine if parental alienation is occurring. These factors include (1) the child either completely or totally rejecting a parent, (2) the presence of a prior positive relationship between the rejected parent and the child, (3) the rejected parent's not engaging in physical or sexual abuse or having any other serious mental illness that would interfere with reasonable parenting, (4) the favored parent's engaging in some or many of 17 alienation behaviors, and (5) the child exhibiting some or many of 8 characteristics of alienation.

Blotcky then provided the 17 criteria within the fourth factor and the 8 characteristics within the fifth factor. The 17

alienating behaviors displayed by the favored parent are (1) bad-mouthing the rejected parent, (2) limiting the rejected parent's visits, (3) interfering with the rejected parent's parent-child communication, (4) not mentioning the rejected parent at home, (5) withholding love and approval from the child if rejection is not demonstrated, (6) telling the child that the rejected parent does not love them, (7) forcing the child to choose between parents, (8) creating the impression that the rejected parent is dangerous, (9) forcing the child to reject the rejected parent, (10) confiding in the child about adult topics and court issues, (11) asking the child to spy on the rejected parent, (12) asking the child to keep secrets from the rejected parent, (13) referring to the rejected parent by first name only, (14) referring to a stepparent as the child's mother or father, (15) withholding medical and educational information from the rejected parent, (16) changing the child's name, and (17) undermining the authority of the rejected parent.

The eight characteristics of an alienated child include (1) the child's engaging in an ongoing campaign of anger and negativity toward the rejected parent; (2) the child's anger being based on weak, frivolous, or even absurd reasons; (3) a totally negative view of the rejected parent; (4) the "independent-thinker phenomenon" where the child articulates that the alienation was the child's own decision; (5) the child's absence of guilt about the treatment of the rejected parent; (6) the child's unwavering support for the favored parent; (7) the child's copying the favored parent's words or scenarios; and (8) the child's rejecting the rejected parent's family.

Blotcky next explained how Theo's relationship with Haley exhibited many of these criteria. He was particularly concerned that Theo's view of Haley was "totally negative." He did not care if he saw Haley, did not want to form a relationship with her, and had no positive things to say about her. Blotcky testified that this was concerning because children instinctively want to have positive relationships with both parents. More so, Blotcky did not believe that Theo's negativity made sense.

He did not believe that Haley's absence was a legitimate reason for Theo to have such strong feelings against her.

Blotcky testified that Tyson was the primary cause of Theo's alienation of Haley. And because Blotcky thought Tyson was to blame, he believed it was Tyson's responsibility to encourage Theo to reestablish a relationship with her. He indicated that Tyson should do "whatever it takes to get him to go" on visitations with Haley, even if that involved physically forcing Tyson into her car. Further, to help counter Theo's alienating behaviors, Blotcky recommended cutting off all contact between Tyson and Theo for 90 days and giving Haley primary custody during that time.

Newring is a licensed psychologist who performed a parenting assessment and psychological evaluation on Haley in July 2022 to determine whether she was able to adequately care for Theo. For the parenting assessment, Newring believed that Haley was effectively managing her multiple diagnoses and he did not think that there was a reasonable basis to limit her parenting time.

However, Newring identified several barriers to Haley's ability to reconnect with Theo. He thought that Theo's apprehension toward Haley was due to a fear of being abandoned again. More so, he attributed much of this reluctance to Tyson's disproportionate amount of influence over him. His report stated it more plainly by determining that Tyson's influence had led Theo to be so "programmed[, instructed,] or coached at the fundamental level to present concerns . . . that limit Haley's opportunity to parent." And while he never specified that Tyson's actions were intentional, he believed that Theo was gathering information from him that perpetuated mistrust toward Haley. Newring believed that having a positive relationship with Haley was in Theo's best interests and recommended that the court hold the parents accountable and not let Theo dictate the process if it wanted to see Haley and Theo reunified.

### (c) Haley, Tyson, and Theo

Haley first testified about the various custody arrangements she and Tyson had since their divorce, her mental health problems, her struggles with addiction, and the proceedings leading up to the trial. She explained that after the divorce she was diagnosed with "ADHD," depression, and anxiety. But it was not until she lost her health insurance in 2019 that she began to struggle with drugs. She said that she had been sober for 3½ years and that despite her struggles, she had never used drugs in front of Theo.

Haley explained that although she met the conditions to begin visitations with Theo in November 2020, Tyson did not allow her any contact with Theo until the court ordered it in May 2021. Once the court required him to abide by the parenting plan, she attempted to visit Theo without much success. She explained that during these attempts, Tyson would interfere or try to dissuade Theo from going with her. She brought up the June 2021 incident when Brittany called the police and how Tyson continually interfered on this occasion and would not let her speak with Theo alone. She also pointed to the other incident involving the police from July 2021. She expressed frustration that on this occasion, Tyson did not come out of the house, speak to the officers, or attempt to encourage Theo at all. Haley believed that if Tyson encouraged Theo more, he would be less reluctant to forming a relationship with her.

Haley also discussed her current living arrangement. She stated that she received monthly Social Security disability income of $1,600 for her and her other son, who has nonverbal autism and a severe speech delay. She testified that she had only $60 to $90 in savings and could not afford to live alone. Because of this, she lived with her mother, who helped her with both children. Haley said that she spent most of her free time attending her meetings and taking care of her other son.

Haley then discussed her relationship with Theo. She said that initially during her parenting time, they used to play

video games, watch television, and play sports, but that Theo became less enthusiastic about those activities over time. She stated that around the time Theo's behavior changed, Tyson was sending more emails that raised issues with how she was parenting him. In these emails, Tyson expressed concern about Theo's mood changes and talked about how he was sad and reclusive after their visits. More so, Tyson raised concerns about Theo's saying that "he wished he wasn't alive."

In July 2021, Tyson sent Haley several more emails wherein he informed her that Theo did not want her to attend his upcoming swim meet. The emails acknowledged that Haley could still attend, but reiterated Theo's request that she not interact with him. Haley still attended the meet and even attempted to talk with Theo afterward. This had an apparent negative impact on Theo, because Tyson emailed Haley later that evening. In this email, Tyson told Haley that she made Theo "extremely uncomfortable, embarrassed, and upset" to the point that he did not want to participate in future meets if she was there. A similar incident occurred several months later when Haley volunteered to help Theo's class on Valentine's Day. Tyson emailed Pasqua about Theo's negative reaction to Haley's coming to his class, and Pasqua told him that Theo consented during a therapy session to Haley's coming and that Pasqua believed that it was a good opportunity for Theo to address some of his anxiety. However, Theo later told Tyson that he did not want to go to school if she was going to be there and ultimately did not attend school that day.

Haley testified that Theo was never able to articulate why he did not want to spend time with her. She explained that Theo was reluctant to talk with her when Tyson was around but that he became more enthusiastic when they were alone. She spoke specifically about transfers and how Theo cried when Tyson dropped him off, but immediately calmed down after he left. Haley believed that Theo's behavior was caused by Tyson's influence over him and that his reluctance to encourage visits inhibited her ability to form a relationship

with Theo. She also believed that Vogel should no longer be Theo's therapist, that Tyson should pay her attorney fees, and that Tyson needed therapy to help him take responsibility for her and Theo's strained relationship.

During his testimony, Tyson disagreed that he was the cause of Haley and Theo's issues. He stated that he always encouraged Theo to go with Haley and never disparaged her. But he also indicated that he was honest with Theo about Haley's issues and expressed concern about her risk of relapse. Tyson said that he had witnessed other family members struggle with drug addiction and wanted to protect Theo from that as much as possible. He said that Haley had already disappeared from Theo's life twice and that he was the one who put everything back together afterward. And although he was honest with Theo about Haley's past, he stated that he "sugarcoat[ed]" the details, telling Theo about Haley's improvements and commitment to sobriety, and that he spoke positively about the efforts she was making to reconnect with Theo.

Tyson also talked about Haley's multiple failed attempts to pick up Theo from his house. He said that after the first visit when the police were called, he decided to reduce the chance of conflict by staying inside when Haley came to pick up Theo. He then discussed how Haley thought it was his responsibility to make Theo go with her. He expressed frustration about this and said Haley refused his help unless it involved him parenting Theo for her. He did not agree that it was his role to force Theo to go and believed Haley needed to learn how to exert parental authority. Tyson agreed that it was important for Theo to have a relationship with Haley, but believed the current custody arrangement was sufficient to ensure that.

Theo testified in chambers outside the presence of Tyson and Haley. He said that he did not see Haley for 2 years because she was sick and "[doing] bad stuff." At first, he stated that he only assumed she was doing bad things because she was gone for so long, but later, he said that Haley told him everything during family therapy sessions with Pasqua. He

said that Tyson never talked about Haley and did not tell him anything about why she left. He also mentioned multiple times that Tyson encouraged him to go on visits with Haley.

Theo then discussed how he does not like Haley and stopped caring about her because she was gone for so long. He said he felt sad, depressed, and lonely at her house and would rather be with Tyson. He stated that he loved Tyson, but did not feel the same way about Haley. And although he believed his relationship with Haley could improve, he was explicit in that he just liked Tyson more. When asked what custody arrangement he preferred, Theo said that he wanted to live with Tyson "almost all the time" but would be willing to stay with Haley every other weekend. He also stated that he only started to cooperate with Haley's visits because he was told that Tyson could be thrown in jail if he did not go.

### 3. Order

On February 23, 2024, the court issued its order on Haley's amended counterclaim for modification and Tyson's motion to show cause. Although the court did not make any express findings regarding the credibility of the witnesses, it did mention Vogel's prior disciplinary action for dishonesty. The court first determined that there was a material change in circumstances that warranted a custody modification. While the order never specified what exactly that material change was, it pointed to the improvements Haley had made in her life, Tyson's actions that tended to alienate Theo from Haley, and Tyson's influence over Theo. The court then determined that a custody modification was in Theo's best interests because otherwise Tyson would "exert his authority and attempt to continue to undermine the reunification between Haley and [Theo]." With this determination, the court gave Haley joint physical custody and sole legal custody of Theo and it ordered Tyson to pay Haley $759 per month in child support and $20,000 in attorney fees. The court also determined that Tyson did not prove by clear and convincing evidence that Haley

willfully violated the order to pay child support and thus did not find Haley in contempt.

## III. ASSIGNMENTS OF ERROR

Tyson assigns, restated and reordered, that the district court erred by (1) denying his motions for recusal, (2) not granting his amended motion in limine, (3) not granting his motion to compel the discovery related to Clark's communications with Haley's attorney, (4) awarding Haley joint physical custody and sole legal custody of Theo, (5) incorrectly calculating his child support obligation, and (6) awarding Haley $20,000 in attorney fees.

## IV. STANDARD OF REVIEW

[1,2] A recusal motion is initially addressed to the discretion of the judge to whom the motion is directed. *Thompson v. Millard Pub. Sch. Dist. No. 17*, 302 Neb. 70, 921 N.W.2d 589 (2019). An abuse of discretion occurs when a district court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Conley v. Conley, ante* p. 98, 11 N.W.3d 671 (2024).

[3,4] Generally, the control of discovery is a matter for judicial discretion, and decisions regarding discovery will be upheld on appeal in the absence of an abuse of discretion. *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023). The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion. *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016).

[5] In a dissolution action or modification of a decree related to child custody, visitation, or support, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. See *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

## V. ANALYSIS

### 1. Recusal

Tyson assigns the district court erred when it denied his motions for recusal. He argues the court displayed bias against him by making rulings without evidence and proceeding without reason in many of its decisions. More specifically, he asserts the court demonstrated bias when it temporarily modified the custody arrangement without any legal basis, issued a temporary custody modification that gave "a mentally ill addict who had not had an overnight visit with her son in over 3 years" more parenting time, overruling almost every objection made by his attorney, and being directly hostile toward him and his attorney. Brief for appellant at 13.

[6] To demonstrate that a trial judge should have recused himself or herself, the moving party must show that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *Timothy L. Ashford, PC LLO v. Roses, supra.* See, also, *State v. Ezell*, 314 Neb. 825, 993 N.W.2d 449 (2023) (stating question is not simply whether someone could conceivably question judge's impartiality).

[7] The Nebraska Revised Code of Judicial Conduct requires that "'[a] judge shall hear and decide matters assigned to the judge, except when disqualification is required . . . .'" *In re Interest of A.A.*, 307 Neb. 817, 860, 951 N.W.2d 144, 176 (2020), *supplemented by* 308 Neb. 749, 957 N.W.2d 138 (2021). The code further states that "'[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . .'" *Id.* Under the code, such instances in which the judge's impartiality might reasonably be questioned specifically include where "'[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer . . . .'" *Id.* However, there exists a presumption of judicial impartiality, and a party alleging that

a judge acted with bias or prejudice bears a heavy burden of overcoming that presumption. *Id.*

[8] We first note that although Tyson's assignment of error takes issue with multiple actions of the district court judge, he fails to specify most of them with any particularity. For instance, his brief argues the court was biased because it overruled every proper objection made by his counsel. However, Tyson fails to cite to any of these instances in the record. Tyson also asserts the court displayed bias by modifying the custody arrangement on a temporary basis when there was no basis in law for such orders. But again, Tyson provides no citations to the record and fails to offer any legal argument to support this claim. It is not the duty of a court to scour the record in search of facts that might support a claim. *In re App. No. C-4973 of Skrdlant*, 305 Neb. 635, 942 N.W.2d 196 (2020). The only issue Tyson provides any meaningful citation for in this assignment is his allegation that the court was openly hostile toward him and his attorney. Because of this, we limit our review of this assignment to whether the district court judge's alleged hostility displayed bias to the point the judge should have recused herself.

The examples Tyson cites of hostility displayed by the district court judge include the judge's relaying an in-chambers conversation with the parties' counsels where Tyson's attorney disagreed with the judge's articulation of what they discussed and the judge's expressing frustration that Tyson was not doing what she wanted when Theo refused to go on Haley's visits. Another example was a colloquy between the judge and Tyson's attorney after his attorney objected to one of Newring's answers as nonresponsive:

> [Tyson's attorney:] Objection. Nonresponsive.
>
> THE COURT: Overruled.
>
> [Tyson's attorney:] It's a yes-or-no question, Judge.
>
> THE COURT: You're asking him a question, he's answering it. Let him answer.
>
> [Tyson's attorney:] Judge, it's a yes-or-no question.

THE COURT: Really? Okay. We'll make sure everything is exactly how you want it.

[Tyson's attorney:] I don't wish to have an argument with the Court. On cross-examination it's primarily what we elicit.

He also cites another colloquy between his attorney and the judge:

[Haley's attorney:] Objection. Lacks foundation.

THE COURT: Sustained.

[Tyson's attorney:] Offer of proof.

THE COURT: No.

[Tyson's attorney:] The Court's denying me the opportunity for an offer of proof?

THE COURT: I am, because we've gone over all this, this prior testimony.

[Tyson's attorney:] So that's a "no," Judge?

THE COURT: That's my decision. Yes.

And lastly, Tyson cites to the following back-and-forth that occurred during Theo's in-chambers testimony:

[Tyson's attorney:] Judge, I'd like the record to reflect the child is weeping, the child is crying.

THE COURT: Weeping is not what's happening. He is not — there's not even tears going down his face.

[Tyson's attorney:] He's sniffling.

THE COURT: We got him some water. [Tyson's attorney,] you wanted to call him as a witness —

[Tyson's attorney:] I understand.

THE COURT: — and that's what we're doing. This is what happens.

[Tyson's attorney:] I'm stating for the record what the demeanor of the witness is at this time, because it won't be otherwise reflected.

THE COURT: That's great, but I also want the record to reflect that you wanted him called and these are the kinds of questions that get asked of an 11-year-old in this situation.

We determine that Tyson fails to overcome the presumption of judicial impartiality. None of the cited instances of conduct by the district court, or even when the conduct is viewed together, rise to the level where a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness. There is a stark contrast between instances where a judge expresses frustration toward an attorney and instances that validly bring a judge's impartiality into question. Accordingly, we determine that the district court did not abuse its discretion in denying Tyson's motions for recusal.

## 2. Motion in Limine

Tyson next assigns the district court erred by not granting his motion in limine that requested the exclusion of Newring's and Blotcky's testimonies. We determine this assignment fails because Tyson did not assign the admission of the experts' testimonies at trial as error.

[9,10] A motion in limine is a procedural step to prevent prejudicial evidence from reaching the jury. *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020). It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. *Id.* Therefore, when a court overrules a motion in limine to exclude evidence, the movant must object when the particular evidence is offered at trial in order to predicate error before an appellate court. *Id.* An appellant who has assigned only that the district court erred in denying a motion in limine has not triggered appellate review of the evidentiary ruling at trial. *Id.* Because Tyson's assignment of error challenges only the court's ruling on the motion in limine, it presents nothing for appellate review.

## 3. Motion to Compel

Tyson next assigns the district court erred by not granting his motion to compel the discovery related to Clark's communications with Haley's attorney. Haley asserts the court did

not err because this information was protected by attorney-client privilege.

[11,12] We note that it does not appear from the record that Tyson ever filed a motion to compel this discovery. Instead, the record shows the court ruled only upon Haley's objection to Tyson's subpoena. This court has long held that to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Toro v. Toro*, 30 Neb. App. 158, 966 N.W.2d 519 (2021). And while we acknowledge that leeway is given in other circumstances when a title does not reflect the substance of an argument, we have routinely applied strict standards to assignments of error. See *In re Guardianship & Conservatorship of Maronica B.*, 314 Neb. 597, 603, 992 N.W.2d 457, 462 (2023) ("[w]hen the title of a filing does not reflect its substance, it is proper for a court to treat a pleading or motion based on its substance rather than its title"). But see Daniel L. Real, Nebraska Appellate Practice and Procedure § 10:4 at 94 (2024) ("[i]t is crucial to recognize the necessity of care in presenting [the assignments of error section] of the brief, as the appellate court's consideration of the case will be limited only to errors that are both clearly assigned in this section and clearly discussed in the argument section of the brief"). Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. *State v. Brennauer*, 314 Neb. 782, 993 N.W.2d 305 (2023).

The lack of a motion to compel also has an important impact on the burden of proof for this assignment. *Toro v. Toro, supra*. If Tyson had filed a motion to compel the requested discovery, the district court would have had to follow the guidelines prescribed in *Greenwalt v. Wal-Mart Stores*, 253 Neb. 32, 567 N.W.2d 560 (1997). In short, those guidelines place the burden of proof on the party asserting the attorney-client privilege. *Id.* But Tyson did not file a motion to compel. See Neb. Ct. R. Disc. § 6-337 (rev. 2025). Instead,

the court ruled on Haley's objection. With this posture, Tyson could only assign the district court's ruling on Haley's objection as error. Because of this, this assignment of error is no different than any other discovery ruling where Tyson bears the burden of demonstrating that the court's decision was an abuse of discretion. See *Moreno v. City of Gering*, 293 Neb. 320, 326, 878 N.W.2d 529, 534 (2016) ("[d]ecisions regarding discovery are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion").

[13] Although Tyson's assignment of error takes issue with a ruling on a nonexistent motion, we elect to review this assignment for plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Brennauer, supra*. Given that there is no evidence as to whether the documents sought were protected by Clark's attorney-client privilege, we are unable to determine that the court plainly erred. Except for the arguments made at the hearing on Haley's objection to the subpoena, we have no evidence as to what the emails between Clark and Haley's attorney contained, when Clark hired Haley's attorney, and whether their communications were privileged. Without any further information, we are unable to determine whether the privilege applied or whether the district court abused its discretion in sustaining Haley's objection. Accordingly, we determine the court did not plainly err in sustaining Haley's objection to Tyson's subpoena.

## 4. MODIFICATION OF PHYSICAL AND LEGAL CUSTODY

[14,15] Tyson next assigns the district court erred by awarding Haley joint physical custody and sole legal custody of Theo. Custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action. *Conley v. Conley,*

*ante* p. 98, 11 N.W.3d 671 (2024). It is the burden of the party seeking modification to show a material change in circumstances. *Id.* Specifically, the movant must show two elements: First, that since entry of the most recent custody order, there has been a material change in circumstances that affects the child's best interests, and second, that it would be in the child's best interests to change custody. *Id.*

[16] Consideration of the child's best interests involves a combination of both mandatory and permissive factors. *Id.* Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) requires that certain factors must be considered, including (1) the relationship of the child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Conley v. Conley, supra.* Other relevant considerations that may also be considered include the stability of the child's existing routine, minimization of contact and conflict between the parents, and the general nature and health of the child. *Id.* No one factor is dispositive, and various factors may weigh more or less heavily, depending on the case. *Id.*

### (a) Was There Material Change
### in Circumstances?

Tyson argues there was no material change in circumstances that warranted the modification because Haley was, and still is, a "mentally ill disabled drug user" whose "prognosis in remaining sober is guarded at best." Brief for appellant at 19. We determine that the district court did not abuse its discretion in determining there was a material change in circumstances affecting Theo's best interests because Tyson did not comply with the visitation schedule outlined in the October 2, 2019, order and has continued to alienate Haley from Theo.

Although Haley met the conditions to begin visitations with Theo in November 2020, Tyson did not allow her any contact with him until the court ordered it in June 2021. But even when he complied with the court's order, his influence over Theo led to the continued alienation of Haley. After going on two visits in June and July 2021, Theo refused to participate in any further visitations until the court amended the parenting schedule in March 2023.

Theo's negative view of Haley and reluctance to participate in visits with her coincide with Blotcky's description of parental alienation. Blotcky explained how Theo's view of Haley was "totally negative" and counter to a child's instinct to seek a positive relationship with both parents. Further, he did not believe Haley's absence was a legitimate reason for Theo's extreme feelings. Given this, Blotcky opined that Tyson was the primary cause of Theo's reluctance to form a relationship with Haley. Batter expressed a similar belief that Tyson was at least partially responsible for Theo's anger toward Haley. And Newring generally believed that Tyson's influence over Theo had led him to be "programmed[, instructed,] or coached" to mistrust her.

Given Tyson's noncompliance with the October 2, 2019, parenting plan and Theo's continued alienation of Haley, we determine that it was neither unreasonable nor untenable for the district court to find a material change in circumstances had occurred that affected Theo's best interests. Therefore, we determine the district court did not abuse its discretion in finding that there was a material change in circumstances that warranted a modification of custody.

### (b) Did District Court Err When It Awarded Haley Joint Physical Custody?

Tyson generally argues that modifying the physical custody arrangement was not in Theo's best interests because Haley exhibits an inability to exert parental authority, was the reason for their strained relationship, and continues to pose risks

to his safety. We determine the court did not abuse its discretion in awarding Haley joint physical custody because Haley does not pose the risks Tyson asserts and having a relationship with Haley is in Theo's best interests.

The evidence does not support Tyson's assertion that Haley poses undue risks to Theo. After completing a parenting assessment for Haley, Newring opined that there was no reasonable basis to limit her parenting time. And while Haley's history of drug addiction places her at a continuous threat of relapse, the evidence demonstrates that she has made meaningful changes to mitigate those risks. Haley graduated from Community Alliance and drug court in February 2022, has been sober for 3½ years, and now attends multiple classes to address her problems. As Newring explained, methamphetamine relapses typically occur early on in a person's sobriety. So, while Haley's risk of relapse will never be zero, the fact that she has been sober for multiple years reduces that risk.

In addition, to further lower her risk of relapse, Haley continues to attend multiple weekly meetings for Alcoholics Anonymous, Narcotics Anonymous, and "Dual Recovery Anonymous." With these changes, she was able to progress through the October 2, 2019, parenting plan to achieve less restrictive visitations with Theo. Given her multiyear history of success in combating her problems, we determine that she does not currently pose an undue risk to Theo.

The evidence also demonstrates that having a relationship with Haley is in Theo's best interests and that there were barriers to their relationship under the prior custody arrangement. There was much evidence presented at trial regarding Theo's negative attitude toward her and the perceived causes of that negativity. Pasqua believed that Theo was angry at Haley because he felt abandoned by her. Batter talked about how Theo felt sad at Haley's house and attributed some of the difficulty in reestablishing a relationship to Tyson's influence. Blotcky discussed Theo's totally negative attitude toward Haley and stated that Tyson was the primary cause of

Theo's alienating her. Newring's report found that Tyson had either intentionally or inadvertently programmed and coached Theo to have negative feelings toward Haley that inhibited their relationship. And Theo discussed how he felt lonely and depressed at Haley's house, did not care about forming a relationship with her, and preferred to spend time with Tyson.

Beyond these testimonies, the numerous videos depicting Haley's failed attempts to pick up Theo from Tyson's house illustrate Theo's reluctance to build a relationship with her. And even though there have been successful visits since Tyson began dropping Theo off at Haley's house, Theo still expresses negative attitudes toward her. Importantly, Theo's articulation of his time with Haley contrasts with her account. While Theo said he and Haley rarely did things during her parenting time, Haley listed activities they did together and provided numerous photographs of them enjoying time with one another.

Because it was generally agreed that having a relationship with Haley was in Theo's best interests, we cannot say that the court's modification of custody was untenable or unreasonable.

We acknowledge there was evidence that demonstrated Tyson was making efforts to encourage Theo to form a relationship with Haley. Beyond Tyson's own testimony, Theo said that Tyson never disparaged her and encouraged him to go on the visits. Vogel also stated that Tyson was taking the appropriate steps in encouraging Theo's relationship with Haley while still being honest about what occurred previously. And Pasqua stated that Tyson was willing to encourage Theo to build a relationship with Haley. However, even if Tyson was encouraging Theo in the ways mentioned, the evidence still clearly shows a barrier to Haley and Theo's relationship was caused, at least in part, by Tyson's influence over him.

Given Theo's apparent inability to form a relationship with Haley under the prior custody arrangement, we determine the court did not abuse its discretion in giving Haley joint physical custody of Theo. There was sufficient evidence to justify

the court's decision to give Haley joint physical custody in the hopes that such a change would limit Tyson's influence over Theo and benefit his relationship with Haley.

### (c) Did District Court Err When It Awarded Haley Sole Legal Custody?

[17,18] We next determine the court did not abuse its discretion in determining that it was in Theo's best interests to award Haley sole legal custody. Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2024) defines "legal custody" as the "authority and responsibility of the parents for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Courts typically do not award joint legal custody when the parties are unable to communicate effectively. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). Where the parties are unable to communicate and trust one another, joint decisionmaking by the parents is not in the child's best interests. *Id.*

The evidence demonstrates that Haley and Tyson are not able to effectively communicate. Examples of this include the argument that led to the police being called on June 19, 2021, when Haley attempted to pick up Theo from Tyson's house, and the series of emails where Tyson expressed frustration about Haley's attending Theo's swim meets and volunteering at his school on Valentine's Day. Notably, regarding the incident at the school, once Haley indicated that she was still going, Tyson allowed Theo to be absent that day.

Given their inability to effectively communicate and Theo's exhibited signs of parental alienation of Haley, we determine the court's decision to give Haley sole legal custody was neither untenable nor unreasonable. When Tyson had sole legal custody, he created obstacles to Haley and Theo's relationship. He prohibited Haley from visiting Theo and engaged in behaviors that allowed for her alienation. As multiple witnesses testified that having a relationship with Haley was in Theo's best interests, Tyson's actions displayed an inability

to make good decisions for Theo. Due to the negative impact that Tyson's having sole legal custody had on Theo's relationship with Haley and our lack of confidence in the parties' abilities to effectively handle a joint legal custody relationship, we determine the court did not abuse its discretion in awarding Haley sole legal custody of Theo.

## 5. CHILD SUPPORT

Tyson next assigns the district court erred in its calculating of his child support obligation. He argues that the court adopted Haley's calculation without considering the amount he paid to support his other children. He asserts that the introduction of his tax returns from 2021 and 2022 prove the existence of these other children and that he should have been given a credit for the regular support he provides them.

[19,20] In general, child support payments should be set according to the guidelines established pursuant to Neb. Rev. Stat. § 42-364.16 (Reissue 2016). *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999). However, the trial court may deviate from the guidelines whenever the application of the guidelines in an individual case would be unjust or inappropriate. *Prochaska v. Prochask*a, 6 Neb. App. 302, 573 N.W.2d 777 (1998). In *Lodden v. Lodden*, 243 Neb. 14, 497 N.W.2d 59 (1993), the Supreme Court found that the trial court did not abuse its discretion when it failed to consider the father's obligation to provide support for the child of his second marriage in determining the proper amount of support for the child of his first marriage. The court noted that the guidelines "do not provide for an automatic deduction for the support of children of subsequent marriages." *Lodden v. Lodden*, 243 Neb. at 19-20, 497 N.W.2d at 62. See Neb. Ct. R. § 4-205(E) (rev. 2016) ("credit *may* be given for biological or adopted children for whom the obligor provides regular support") (emphasis supplied).

However, in *State on behalf of S.M. v. Oglesby*, 244 Neb. 880, 510 N.W.2d 53 (1994), the Supreme Court reversed the

trial court's child support determination because the court was unable to ascertain if the trial court considered the father's obligation to his present family and whether that obligation warranted a deviation from the guidelines. The court stated:

> If the support ordered by the court in this case gives no consideration at all to the present children, we find that the trial court abused its discretion in not first determining that, under the particular facts of this case, the strict application of the guidelines would be unjust or inappropriate, as set out in the Nebraska Child Support Guidelines . . . .

*State on behalf of S.M. v. Oglesby*, 244 Neb. at 886, 510 N.W.2d at 57-58.

[21] In the present case, the district court did not consider the amount of support Tyson provided to his other children. In adopting Haley's calculation of child support, the court adopted her claim that she and Tyson each paid $0 for the "Regular Support for Other Children," although they each have children with other partners. However, upon a review of the record, it does not appear that Tyson ever requested, orally or in writing, for the court to grant him a credit for the support he provides his other children. A trial court cannot err in failing to decide an issue not raised, and an appellate court will not consider an issue for the first time on appeal that was not presented to or passed upon by the trial court. *Walker v. Probandt*, 29 Neb. App. 704, 958 N.W.2d 459 (2021).

To the extent Tyson asserts the court should have granted him a credit absent a specific request, we determine that he failed to provide the court with the necessary evidence to make such a calculation. While Tyson points to his tax returns from 2021 and 2022 as evidence of the support he provides his other children, those returns only list those children as dependents and do not distinguish between his and his wife's incomes. More so, the record does not contain Tyson's W-2 form from 2022 or 2023, his 2023 tax return, or any paystubs after May 2023. In addition, Tyson did not offer his own

proposed child support worksheet, nor did he object to the offer of Haley's proposed child support worksheet—notwithstanding that Haley's was only received as an aid to the court.

[22] Accordingly, there is no monetary figure that the court could have applied to Haley's calculation to give Tyson the deduction he seeks. So, although the court may have had an obligation under *State on behalf of S.M. v. Oglesby, supra*, to consider the amount of support Tyson provided his other children, there was nothing in the record for it to consider. The district court cannot err by failing to consider something not in the record. See *Cain v. Custer Cty. Bd. of Equal.*, 315 Neb. 809, 823, 1 N.W.3d 512, 524 (2024) ("[a] fact finder can rely only on evidence actually offered and admitted at trial and is not permitted to rely on matters not in evidence"). Consequently, we are unable to determine the district court abused its discretion in not considering Tyson's support for his other children when there was insufficient evidence introduced for the court to consider in its calculation.

### 6. Attorney Fees

Tyson next assigns the district court erred in awarding Haley $20,000 in attorney fees. He argues the fees were improper because he only defended against Haley's counterclaim, the court did not make a finding that the fees were reasonable, and the court did not inquire into the relative economic circumstances of the parties.

[23-25] Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Hawks v. Hawks*, 32 Neb. App. 70, 993 N.W.2d 688 (2023). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id.* A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022). Thus, there was authority, in this modification of a dissolution

decree case, for the awarding of attorney fees. See *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

[26] It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.* And while the Supreme Court has said that it will not require an affidavit to support an attorney fee award, it noted that providing an affidavit is always the best practice. See *id.*

Haley's attorney provided an affidavit to support the attorney fee award. This affidavit is 45 pages long and claims 221 hours 21 minutes of legal services spanning from August 24, 2021, until June 12, 2023. For this work, Haley was billed $87,170. The affidavit also approximates an additional $6,000 for the anticipated expense of a 16-hour trial.

We determine the district court did not abuse its discretion in awarding Haley $20,000 in attorney fees. In its order, the court stated that it was awarding the fees because Haley was the prevailing party and that Tyson had unnecessarily prolonged the case by interfering with the reunification process. These proceedings took place over the course of several years and involved the taking of depositions, numerous motions to compel and to show cause, hearings on those motions, and a multiday trial. With this history, along with Haley's attorney's affidavit displaying an approximate amount of $93,170 in legal fees, we cannot conclude that awarding Haley, as the prevailing party, $20,000 in attorney fees was unreasonable or an abuse of discretion.

## VI. CONCLUSION

We determine the district court did not abuse its discretion by not recusing itself. We do not address Tyson's assignment of error concerning the denial of his motion in limine because

he failed to assign the ultimate admission of the evidence at trial as error. We determine the district court did not plainly err in denying Tyson's motion to compel discovery of Clark's communications with Haley's attorney. We also determine the court did not abuse its discretion by awarding Haley joint physical custody and sole legal custody of Theo, not considering Tyson's other children in its child support calculation, and awarding Haley $20,000 in attorney fees.

Affirmed.